**WO**  NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Chase Michael Sutton,

    Plaintiff,

v.

Carolyn W. Colvin,

    Defendant.

No. CV-15-00744-PHX-JJT

**ORDER**

At issue is the denial of Plaintiff Chase Michael Sutton's Application for Supplemental Security Income ("SSI") by the Social Security Administration ("SSA") under the Social Security Act ("the Act"). Plaintiff filed a Complaint (Doc. 1) with this Court seeking judicial review of that denial, and the Court now considers Plaintiff's Opening Brief (Doc. 14, "Pl.'s Br."), Defendant Social Security Administration Commissioner's Opposition (Doc. 18, "Def.'s Br."), and Plaintiff's Reply (Doc. 22, "Pl.'s Reply").

**I.  BACKGROUND**

Plaintiff filed an SSI Application under the Act on January 4, 2012, for a Period of Disability beginning November 17, 2011. (Doc. 11, R. at 193.) Plaintiff's claim was denied initially on July 3, 2012 (R. at 76-77); and on reconsideration on December 12, 2012 (R. at 97-98). Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on September 26, 2013. (R. at 32-62.) On November 15, 2013, the ALJ issued a decision denying Plaintiff's claim. (R. at 13-31.) The Appeals Council ("AC")

denied Plaintiff's request for review on February 24, 2015, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) The present appeal followed.

The Court has reviewed the medical evidence in its entirety and provides a short summary here. Plaintiff has been diagnosed with Crohn's disease, which is characterized by abdominal pain, diarrhea, bloody stool, and fatigue, and is treated with topical anti-inflammatory medication, corticosteroids, and immune modulators. (Pl.'s Br. at 2 n.1 (citing *Goldman's Cecil Med.*, 24th ed. 2012, at 913-17).) The record shows that Plaintiff visited various emergency rooms reporting Crohn's disease episodes, or "flares," twice in 2011 and 11 times in 2012. (R. at 301-02, 330-31, 368-69, 509-10, 577-79, 584-85, 609-14, 615-27, 642-43, 661-64, 725-26.) In each visit, the hospitals prescribed Plaintiff pain medications—including Vicodin, Ultram (Tramadol), Percocet, Norco, and morphine—among other medications. In February 2012, Dr. Frederick Kogan, a gastroenterologist, examined Plaintiff. He noted that, though Plaintiff's Crohn's disease was in remission, Plaintiff had "unfortunately gotten into a drug-seeking behavior where he has been to every emergency room in the west of Phoenix, in the north quarter, mid-quarter north, and John C. Lincoln Hospital. He has also been down to Estrella with abdominal pain, receiving narcotics." (R. at 371.) Dr. Kogan was "unsure if this is gastroenteritis" and "not convinced that this could be a Crohn's exacerbation," so he ordered tests. (R. at 372)

Later in 2012, Plaintiff also made three visits to Dr. Joseph B. Fares, a gastroenterologist, and Dr. Fares noted among other things that Plaintiff "reports doing fairly well with no significant GI complaints," (R. at 496), and "reports some improvement in his symptoms," (R. at 487). Dr. Fares conducted a colonoscopy on October 12, 2012, and Plaintiff's colon appeared normal and biopsies showed mild nonspecific subacute inflammation but no evidence of colitis. (R. at 557.) Dr. Fares planned to taper Plaintiff off steroids. Dr. Hugo Pinillos examined Plaintiff on October 30, 2012, and found that Plaintiff was improving and that it was uncertain from his symptoms whether Crohn's disease was active and, if so, where. (R. at 558.) Plaintiff

reported to the emergency room again in April 20, 2013, stating he had not had a Crohn's disease flare since 2012 and had not taken steroids since then. (R. at 717.)

Plaintiff also states he suffers from headaches. The record shows that Plaintiff reported to the emergency room a multitude of times in 2011 reporting headaches, and the hospital prescribed Ultram (Tramadol), a narcotic pain medication. (R. at 328, 334.) On March 20, 2011, Arrowhead Hospital noted that it was Plaintiff's fifth visit in 30 days for a headache, that he reported he was out of Ultram, and that it was the "only thing that works." (R. at 334.) Plaintiff visited Dr. Mark Winograd five times in 2012 to address his headaches. (R. at 455-69, 713-16.) Plaintiff reported that Tramadol and Valium seem to be effective to fight his headaches. (*E.g.*, R. at 467.) Dr. Winograd also prescribed Imitrex, among other medications, for Plaintiff to take if he felt a headache coming on. (*E.g.*, R. at 458.)

In October 2011, within one week of visiting the emergency room for a headache, for which he was prescribed Ultram, Plaintiff went back to the emergency room to report dental pain, at which point the hospital noted Plaintiff was already under a pain protocol. (R. at 326-29.) Plaintiff went to the emergency room again for dental pain two weeks later, at which point the hospital noted that Plaintiff had filled nine prescriptions for Vicodin in the past 30 days. (R. at 324-25.)

Plaintiff has overdosed on pain medications several times. On July 1, 2011, Plaintiff saw Dr. Armaghan Kimbell for a follow-up after a visit to the emergency room for Tramadol overuse. (R. at 383.) Plaintiff stated that he had not taken Tramadol for a few days and as a result was sleeping better but had some nausea. (R. at 383.) Plaintiff reported he went to a drug rehab facility but did not like it and called his wife to pick him up, and he therefore did not want to try rehab again. (R. at 383.) He admitted taking three to four pain pills every six hours instead of just one, as prescribed. (R. at 383.) Dr. Kimbell stated that he would make a note in Plaintiff's chart "that he cannot and may not be prescribed any more narcotics for symptoms."[1] (R. at 383.) Plaintiff also requested

---

[1] The chart to which Dr. Kimbell referred was presumably at Banner Health

- 3 -

his medical records to apply for disability benefits on account of Crohn's disease, and Dr. Kimbell noted that Plaintiff's "Crohn's has been in remission for some time now" but advised him to speak to his gastroenterologist. (R. at 383.)

On February 11, 2012, Plaintiff went to the emergency room after a seizure apparently caused by Tramadol overuse. (R. at 710.) Dr. Jana Lee noted that Plaintiff had also reported on January 31, 2012, after a seizure, at which time the attending physician had advised Plaintiff to stop taking Tramadol and Benadryl. (R. at 710.)

The record shows Plaintiff visited his primary care physician, Dr. Michael P. Brown, three times in 2012. On July 1, 2012, Plaintiff saw Dr. Brown complaining of right knee pain. (R. at 549.) Dr. Brown noted that a physician's assistant had prescribed 30 Vicodin to Plaintiff on June 25, 2012, but Plaintiff reported it made him constipated. (R. at 549, 553.) He then reported to urgent care, which prescribed Ultram for him. (R. at 549.) Because no x-ray of Plaintiff's knee had yet been taken, Dr. Brown did not prescribe additional medication and recommended a follow-up a week later. (R. at 550.) Plaintiff reported to the physician's assistant four days later, who prescribed Ultram for Plaintiff's reported knee pain. (R. at 547.) He reported to the physician's assistant again three weeks later and stated he still had not obtained an x-ray of his right knee, even though he said it continued to be painful. (R. at 544.) Plaintiff received another prescription of Ultram, and the physician's assistant noted that she "talked to him about Tramadol use" and "may need to send to pain management." (R. at 544.) On September 5, 2012, Plaintiff saw Dr. Brown again for reported knee pain. (R. at 541.) Plaintiff had still not obtained an x-ray of his knee, but Dr. Brown gave him a new prescription of Ultram. (R. at 541-42.)

---

Center in Peoria, Arizona, where Dr. Kimbell worked. (R. at 383.) The Court notes that Plaintiff's visits to emergency rooms after his July 2011 examination by Dr. Kimbell were to other hospitals, including Arrowhead Hospital (*e.g.*, R. at 324-27), Phoenix Baptist Hospital (*e.g.*, R. at 368), and Banner Thunderbird Medical Center (*e.g.*, R. at 642), all of which regularly prescribed narcotic pain medications to Plaintiff after Dr. Kimbell's examination.

1    Finally, Dr. Brown saw Plaintiff on October 29, 2012. (R. at 536.) Dr. Brown
2  made no mention of Plaintiff's previously reported knee pain—the subject of the balance
3  of Plaintiff's visits to his office in 2012—but instead noted that Plaintiff had recently
4  been to the hospital for abdominal pain.[2] (R. at 536.) Plaintiff reported to Dr. Brown that
5  the hospital mentioned he had "narcotic seeking behavior." (R. at 536.) He also asked
6  Dr. Brown to fill out a form for him to apply for SSI benefits, stating that he had a hard
7  time keeping a job due to "anxiety, stress and recurrent episodes of abdominal pain
8  associated with Crohn's." (R. at 536.) Dr. Brown filled out a Medical Assessment of
9  Ability to Do Work-Related Physical Activities the same day, in which he concluded in
10  checkbox form that, on account of Crohn's disease, Plaintiff had moderate limitations to
11  being around moving machinery and mild or no limitations in any other activity, but that
12  Plaintiff had a moderate overall degree of restriction, observing that "most of patient's
13  symptoms are subjective." (R. at 534.)

14    On June 20, 2012, Dr. Greg Peetoom completed a psychological evaluation and
15  testing on behalf of the Arizona Department of Economic Security to assess Plaintiff's
16  functional abilities. (R. at 471-78.) While Plaintiff's composite intelligence scores were
17  low, Dr. Peetoom observed that Plaintiff felt rushed through the testing because his
18  mother, who was with him, had to go to work, and the results were therefore
19  underestimates of his true abilities. (R. at 471, 473, 477.) Dr. Peetoom found that Plaintiff
20  is capable of understanding, remembering and carrying out simple work-related
21  instructions, though he "seemed to work in a somewhat rushed manner," he is able to
22  sustain casual social interaction, and he is able to recognize and respond appropriately to
23  normal workplace hazards. (R. at 477.) Two physicians reviewed Plaintiff's medical
24  records (R. at 68-77, 79-98), from which they performed Residual Functional Capacity
25  (RFC) assessments and opined that Plaintiff had no significant restrictions in his ability to
26  move around and perform ordinary daily activities.

---

[2] In fact, according to the record but not Dr. Brown's notes, the recent visit to the hospital for abdominal pain was Plaintiff's ninth visit in 2012 alone.

- 5 -

## II.   ANALYSIS

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a preponderance; it is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. *Id.* At step four, the ALJ assesses the claimant's RFC and determines whether the claimant is still capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends.

*Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

### A. The ALJ Properly Weighed Plaintiff's Testimony

Plaintiff disputes the ALJ's finding that when considering the combination of Plaintiff's impairments, Plaintiff's RFC allowed him to perform light work. Plaintiff's first argument is that the ALJ erred in his consideration of Plaintiff's symptom testimony. (Pl.'s Br. at 6-15.) While credibility is the province of the ALJ, an adverse credibility determination requires the ALJ to provide "specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).

At the hearing, Plaintiff testified that Crohn's disease is the biggest problem preventing him from working and that he has Crohn's disease flares six or more times a year, requiring hospitalization. (R. at 52.) He also testified he vomits eight times every twelve hours on bad days and twice a day on normal days. (R. at 43, 45, 48.) On a Headache Questionnaire, Plaintiff testified he gets headaches that last up to several weeks, at which time he must isolate himself in a dark quiet, room. (R. at 240-41.) At the hearing, Plaintiff's attorney represented that "those have alleviated with time." (R. at 38.)

To begin with, as the ALJ observed, the evidence is not just substantial but overwhelming that Plaintiff continuously engaged in drug-seeking behavior in 2011 and 2012. This is an entirely appropriate basis to conclude that Plaintiff lacks credibility in his symptom testimony. *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001); *see also Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003). He overdosed on Tramadol at least in July 2011 and January and February 2012. (R. at 383, 710.) In July 2011, Plaintiff stated that he understood and agreed with Dr. Kimbell that he "cannot and may not be prescribed any more narcotics for symptoms." (R. at 383.) Yet, by February

2012, Dr. Kogan noted that Plaintiff had "gotten into a drug-seeking behavior where he has been to every emergency room in the west of Phoenix" seeking narcotics. (R. at 371.)

An examination of the record reveals the vast amount of pain medication Plaintiff accumulated by regularly visiting different medical providers, often within days of one another. For example, Plaintiff visited different hospital emergency rooms 11 times in 2012 with reports of abdominal pain due to Crohn's diseases flares, receiving prescriptions for Tramadol (January 3), Vicodin (February 24), Ultram (March 19), Percocet (May 10), Norco (June 13), Vicodin (August 30, September 15, October 8, October 22, November 12), and morphine and Vicodin (December 16). (R. at 301-02, 330-31, 368-69, 509-10, 577-79, 584-85, 609-14, 615-27, 642-43, 661-64, 725-26.) As the Court will address more fully below, the objective medical findings do not support Plaintiff's subjective reports of Crohn's disease flares, or at least their intensity. Meanwhile, Plaintiff visited Dr. Brown and his physician's assistant at least six times in 2012 with reports of knee pain, receiving prescriptions for Ultram. (R. at 535-55.) Nowhere do those records state that Dr. Brown and his assistant were aware Plaintiff was regularly reporting to emergency rooms and receiving narcotics from them. The record also contains no objective evidence that Plaintiff's knee was injured—it appears he never obtained the x-ray that Dr. Brown repeatedly ordered—and instead Plaintiff obtained the prescriptions based on his subjective reports. Simultaneously, Plaintiff visited Dr. Winograd at least five times throughout 2012 reporting headaches—again without mentioning the narcotic pain medications he was taking for his other apparent conditions, according to the record—and Dr. Winograd provided Plaintiff with separate pain medication prescriptions. (R. at 455-69, 713-16.) The ALJ pointed to much of this and other evidence to support his conclusion that Plaintiff engaged in continuous drug-seeking behavior in 2011 and 2012 and thus was not credible as to his symptoms (R. at 17-19), and the ALJ's reason for making an adverse credibility determination was specific, clear and convincing. *See Edlund*, 253 F.3d at 1157.

As the ALJ also stated, Plaintiff's reports of symptoms do not stand up against the objective medical evidence, either. (R. at 17-20.) Aside from Plaintiff's subjective reports, the medical examinations revealed that, in April and May 2011, Plaintiff's Crohn's disease was in remission by prior colonoscopy and the cause of his reported abdominal pain could not be determined by physical examination. (R. at 399-401, 416-18.) In August 2011, a physical examination could only confirm "mild gastritis." (R. at 313-14.) No physical examination in the following year was able to corroborate Plaintiff's subjective reports; the records simply state such things as "unclear etiology" or "no diagnosis found." (R. at 301, 348, 510, 521, 675, 706.) In February 2012, Dr. Nooman Gilani, a gastroenterologist, noted that Plaintiff's reported symptoms were "not consistent with flare of his suspected inflammatory bowel disease" and the "[p]ossibility of viral syndrome or narcotic-seeking behavior can be considered." (R. at 678-80.) In October 2012, Dr. Fares conducted a colonoscopy and found that Plaintiff's colon appeared normal and biopsies showed mild nonspecific subacute inflammation but no evidence of colitis. (R. at 557.) The ALJ referred to the substantial and objective medical evidence (R. at 17-19) and provided another specific, clear and convincing reason to find that Plaintiff's testimony regarding the severity and frequency of his symptoms was not credible. *See Edlund*, 253 F.3d at 1157.

The Court finds no merit to Plaintiff's argument that the ALJ's reasons for discounting Plaintiff's subjective reports were not sufficiently specific. The ALJ reached a clear and convincing credibility determination by referring to specific and substantial evidence in the record, as discussed above, and the ALJ properly applied that determination to all of Plaintiff's symptom testimony. *Turner v. Comm'r, Soc. Sec. Admin.*, 613 F.3d 1217, 1225 (9th Cir. 2010); *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

As the ALJ also stated, Plaintiff's reports of symptoms do not stand up against the objective medical evidence, either. (R. at 17-20.) Aside from Plaintiff's subjective reports, the medical examinations revealed that, in April and May 2011, Plaintiff's Crohn's disease was in remission by prior colonoscopy and the cause of his reported abdominal pain could not be determined by physical examination. (R. at 399-401, 416-18.) In August 2011, a physical examination could only confirm "mild gastritis." (R. at 313-14.) No physical examination in the following year was able to corroborate Plaintiff's subjective reports; the records simply state such things as "unclear etiology" or "no diagnosis found." (R. at 301, 348, 510, 521, 675, 706.) In February 2012, Dr. Nooman Gilani, a gastroenterologist, noted that Plaintiff's reported symptoms were "not consistent with flare of his suspected inflammatory bowel disease" and the "[p]ossibility of viral syndrome or narcotic-seeking behavior can be considered." (R. at 678-80.) In October 2012, Dr. Fares conducted a colonoscopy and found that Plaintiff's colon appeared normal and biopsies showed mild nonspecific subacute inflammation but no evidence of colitis. (R. at 557.) The ALJ referred to the substantial and objective medical evidence (R. at 17-19) and provided another specific, clear and convincing reason to find that Plaintiff's testimony regarding the severity and frequency of his symptoms was not credible. *See Edlund*, 253 F.3d at 1157.

The Court finds no merit to Plaintiff's argument that the ALJ's reasons for discounting Plaintiff's subjective reports were not sufficiently specific. The ALJ reached a clear and convincing credibility determination by referring to specific and substantial evidence in the record, as discussed above, and the ALJ properly applied that determination to all of Plaintiff's symptom testimony. *Turner v. Comm'r, Soc. Sec. Admin.*, 613 F.3d 1217, 1225 (9th Cir. 2010); *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

**B. The ALJ Assigned Proper Weight to the Assessments of Plaintiff's Treating Physicians and Properly Considered the Record as a Whole**

Plaintiff argued the ALJ committed reversible error by assigning inadequate weight to the assessment of one of Plaintiff's medical care providers, Dr. Brown. (Pl.'s Br. at 16-19.) An ALJ "may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing reasons.'" *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing *Lester v. Chater*, 81 F. 3d 821, 830-31 (9th Cir. 1996)). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*

In this instance, the ALJ found that the Medical Assessment of Ability to Do Work-Related Physical Activities completed by Plaintiff's primary care physician, Dr. Brown (R. at 533-34), was contradicted by all the other medical evidence in the record, including some of Dr. Brown's own treatment notes. (R. at 18, 22.) The Court must therefore examine whether the ALJ provided specific and legitimate reasons for discounting Dr. Brown's assessment, supported by substantial evidence when examining the record as a whole. *See Carmickle*, 533 F.3d at 1164.

As the ALJ noted (R. at 22), even in Dr. Brown's assessment, he remarks that the limitations he records cannot be expected to result from the objective clinical or diagnostic findings and that "most of patient's symptoms are subjective," (R. at 534). Indeed, as the ALJ also notes (R. at 22), Dr. Brown's remark that Plaintiff has one to two Crohn's disease flares per month lasting two to three days each (R. at 533) is not supported by any objective medical evidence, including CT scans, x-rays and physical examinations, as the Court discussed above. Moreover, the symptoms Plaintiff subjectively reports and upon which Dr. Brown explicitly relies in his assessment may be secondary to Plaintiff's narcotic pain medication abuse, as was noted throughout the medical record, and not Crohn's disease flares. The ALJ provided specific and legitimate

reasons supported by substantial evidence in the record to disregard Dr. Brown's assessment and thus did not err in doing so.

Plaintiff also argues that the ALJ erred when he gave significant weight to the psychological assessment of Dr. Peetoom, the state examiner, but then "ignored" something Dr. Peetoom stated in his report. (Pl.'s Br. at 19-20.) The Court disagrees. The ALJ interpreted Dr. Peetoom's assessment in detail, pointing out—not ignoring—the fact that Plaintiff exhibited low intelligence in testing but that the results were an underestimate because Plaintiff felt rushed and that Plaintiff's "true mental capacity was indicated to be greater than suggested, as the claimant was able to respond to questions during the examination, maintain eye contact, interact appropriately, comprehend and remember instructions during the evaluation, maintain his personal hygiene independently, and . . . transition from task-to-task." (R. at 22.) Again, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record to credit portions of Dr. Peetoom's assessment and thus did not err in doing so. The ALJ also properly weighed the state examining physicians' opinions (R. at 68-77, 79-98) in conjunction with the medical evidence in determining Plaintiff's RFC. (R. at 21-22.)

## III.    CONCLUSION

Plaintiff raises no error on the part of the ALJ, and the SSA's decision denying Plaintiff's Application for Supplemental Security Income benefits under the Act was supported by substantial evidence in the record.

IT IS THEREFORE ORDERED affirming the November 15, 2013 decision of the Administrative Law Judge, (R. at 13-31), as upheld by the Appeals Council on February 24, 2015, (R. at 1-3).

///

///

///

///

///

- 11 -

1    IT IS FURTHER ORDERED directing the Clerk to enter final judgment
2 consistent with this Order and close this case.

3    Dated this 26th day of September, 2016.

_____
Honorable John J. Tuchi
United States District Judge